# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**CASE NO. _____**

LOGAN AND JULIE KIRLAND, Each Individually and as Next Friends to R.K., L.A., and M.K.,

     Plaintiffs,

  v.

THE MICHAELS ORGANIZATION, LLC, AMC East Communities, LLC, and MMS Air Force, LLC,

     Defendants.

_____/

## **COMPLAINT**

Plaintiffs, Logan Kirland, a Petty Officer First Class in the United States Navy stationed at MacDill Air Force Base in Tampa, Florida ("MacDill"), and his family, Julie Kirland, R.K., L.A., and M.K., suffered personal injuries because they lived in unsafe and unhealthy conditions while in privatized on-base military housing provided and managed by Defendants. Defendants' acts and omissions with respect to their operation, management, and maintenance of Plaintiffs' housing, as detailed in this Complaint, led directly to the unsafe and unhealthy conditions of their residence. Moreover, Defendants concealed these conditions from Plaintiffs through false and

misleading statements and failure to disclose known hazards. When these conditions were discovered, Defendants failed to properly repair and remediate them. Plaintiffs bring this action to hold Defendants accountable for their acts and omissions.

## THE PARTIES

1.      Plaintiffs LOGAN KIRLAND and JULIE KIRLAND resided at Mac-Dill Air Force Base in Tampa, Florida at all times relevant to this complaint. LOGAN and JULIE KIRLAND are the parents of Plaintiffs R.K., L.A., and M.K., who also resided at MacDill at all relevant times.

2.      Defendant THE MICHAELS ORGANIZATION, LLC ("Michaels" or "The Michaels Organization") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Michaels is registered to do business in Florida.

3.      Defendant AMC EAST COMMUNITIES, LLC ("AMC") is a Delaware limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. AMC is listed as the "Owner" on the leases signed by the Plaintiffs.

4.      Defendant MMS AIR FORCE, LLC ("MMS") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. MMS is registered to do business in Florida. MMS has acted as property manager with respect to MacDill housing at all times relevant to this complaint.

5.      Non-defendant HARBOR BAY AT MACDILL ("Harbor Bay") is the entity through which Defendants conducted many of the leasing, management, and

maintenance activities relating to military housing at MacDill. Upon information and belief, it presents itself as the landlord, appearing as the "Landlord/Lessor" on Mold Addenda, even though Defendant AMC is the lessor on the leases. Upon information and belief, Harbor Bay is also listed as the Community Manager on Plaintiffs' lease and lease addenda. Despite conducting extensive business operations in Florida, Harbor Bay is not a registered entity with the Florida Department of Corporations.

6.     In the related action, *Mullins et al. v. The Michaels Organization, LLC, et al.*, Case No. 8:25-cv-02637-SDM-AAS (M.D. Fla.), Defendant AMC represented to the Court that Harbor Bay is a "common or trade name" of Michaels and not a distinct legal entity. Plaintiffs allege the same upon information and belief. On information and belief, Defendants jointly manage, operate, and maintain MacDill military housing and are jointly responsible for the acts and omissions of Harbor Bay. Allegations concerning Harbor Bay therefore constitute allegations concerning Defendants.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The acts and omissions underlying Plaintiffs' claims occurred on a federal enclave, MacDill Air Force Base, over which the United States was ceded exclusive legislative jurisdiction in 1950. Plaintiffs are aware of no developments since 1950 that have had the effect of changing MacDill's status as an exclusive federal enclave. Because the acts and omissions giving rise to Plaintiffs' claims occurred on an exclusive federal enclave, Plaintiffs' claims are governed by federal law under the Federal

Enclave Doctrine for purposes of subject-matter jurisdiction. *See Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952).

8.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Plaintiffs' claims occurred within this District on the federal enclave at MacDill where Plaintiffs were exposed to the conditions at issue.

9.      This Court has personal jurisdiction over Defendants because their acts and omissions—carried out directly and/or through their agents and alter-egos—caused the harms complained of herein which occurred at MacDill. FLA. STAT. §§ 48.193(1)(a)(2), 48.193(1)(a). Defendants also derived substantial revenue, directly or indirectly, from services provided to persons in Florida.

## FACTUAL ALLEGATIONS

### The Military Housing Privatization Initiative

10.      In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"). 141 Cong. Rec. S18853. The MHPI was intended to improve housing for service members and their families by allowing private housing companies to use their resources and expertise in improving existing military housing and new military housing.

11.      Under the MHPI, a private contractor is granted a long-term lease of military base grounds. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing, operating, managing, and maintaining the housing. The government also typically pays the contractor the full Basic Allowance for Housing ("BAH") to which the service member who rents the home is

entitled. In addition, MHPI contractors typically receive performance incentive fees, payable by the military department based on performance objectives, which include maintenance practices and resident satisfaction.

12. In response to concerns about dangerous, unsafe, and unhealthy conditions at MHPI housing, the 2020 National Defense Authorization Act created an MHPI Tenant Bill of Rights. The Tenant Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to receive property management services that meet or exceed industry standards and that are performed by professional customer service and maintenance staff. 10 U.S.C. § 2890. Defendants purport to embrace the Tenant Bill of Rights and to incorporate its protections into their MHPI programs and activities.

13. Landlords are required to provide a housing unit that meets "minimum health, safety, and welfare standards set forth in Federal, State, and local law" and, if a walkthrough prior to move in indicates that those standards are not met, "remediate any issues and make any appropriate repairs[.]" 10 U.S.C. § 2891a(4).

**MHPI Housing at MacDill**

14. In November 2007, AMC East, LLC and the United States Air Force entered into a 50-year lease to privatize military housing at MacDill AFB. In 2021, Michaels acquired the assets of AMC East, LLC and AMC. Michaels either directly or through its subsidiaries or affiliates, assumed all obligations, as the MHPI

contractor, including but not limited to obligations under the ground leases, operating agreements, property management agreements, and residential leases.

15.    Plaintiffs paid their BAH to AMC. In addition, the Air Force pays Defendants for management and maintenance of the property. These payments consist of (1) a monthly base fee and (2) an incentive fee payment upon achieving certain performance criteria. To obtain the incentive fee, Defendants submit documentation and a statement that they satisfied performance criteria, including objectives related to maintenance work orders and customer satisfaction.

16.    Language in the Operating Agreement indicated that the Agreement was intended to further the MHPI's goal of benefiting residents of MacDill military housing.

### Defendants' Joint and Integrated Approach to MacDill Housing

17.    Defendants are members of the Michaels conglomerate, at the top of which sits Michaels. Defendants function as an integrated enterprise in their operation of MacDill housing.

18.    With respect to its activities at MacDill, on information and belief, Michaels operates independently and through entities, including Defendants AMC and MMS and non-defendant Harbor Bay.

19.    The Michaels webpage showcases its involvement in military housing and points to MacDill as one location of its "[q]uality housing from Coast to Coast." Moreover, employees whose e-mail addresses and signature blocks suggest that they

are employed by Michaels regularly work with residents at MacDill, including on leasing and maintenance issues.

20. Defendants were bound in agency and alter-ego relationships in leasing, operating, managing, maintaining, and repairing the homes at MacDill.

**The Unsafe and Unhealthy Housing Conditions at MacDill**

21. Defendants have long known about mold problems at MacDill. Military families have for years submitted complaints about mold and health issues caused by exposure to mold. The standard lease contains warnings about moisture and mold. The Resident Guidelines and Community Handbook stress the need to immediately report signs of leaks, moisture, or mold.

22. For example, upon information and belief, Defendants were aware that numerous homes lacked vapor barriers between the first floor and outdoors or contained defective vapor barriers. This allowed unsafe amounts of moisture to enter the homes. Additionally, the air conditioning units in numerous homes lacked secondary drain lines, causing water to leak into homes.

23. Harbor Bay refused to follow its mold policies, despite knowing that failure to do so would lead to the growth of toxic mold.

**The Kirland Family**

24. Petty Officer First Class ("PO1") Logan Kirland, United States Navy, his spouse, Julie Kirland, and their minor children, R.K., L.A., and M.K., resided at 8404 Roy Hooe Court, at MacDill Air Force Base.

25.    PO1 Kirland entered into a lease agreement with Defendants prior to moving into the residence. Upon information and belief, Plaintiffs' lease listed AMC as the Owner and Michaels Management Services, Inc., or its successor, as the Property Manager, and provided that Florida law governed the lease.

26.    Before the family moved into the residence, Harbor Bay representatives assured PO1 and Ms. Kirland that the home had been fully inspected, that all previously identified issues had been remediated, and that no mold was present. Defendants further represented that the residence was in good, safe, and habitable condition. The identity of these employees should be known to, and within the possession, custody, and control of Defendants. The Kirlands relied on these representations in accepting the residence and moving into the home. Defendants either knew these representations were false or made them without any reasonable basis to know whether they were true, in order to induce the family to accept the residence.

27.    During their tenancy, Plaintiffs observed, came into contact with, ingested, and inhaled mold, experienced elevated interior moisture and water intrusion, and suffered personal injuries due to the unsafe and unhealthy conditions described in this Complaint.

28.    Shortly after moving into the home, the family detected a persistent musty odor emanating from an upstairs bedroom. Harbor Bay Project Manager Aaron Vaughn and Environmental Supervisor Daniel Roman attributed the odor to the family's pets and denied that it was associated with any structural defect, moisture intrusion, or mold-related condition, without performing any testing or meaningful

investigation into its source. Mr. Vaughn and Mr. Roman either knew these denials were false or made them without any reasonable basis to know whether they were true, in order to induce the family to remain in the home without pursuing further complaints. Relying on those representations, the Kirlands remained in the home.

29. Following Hurricane Milton, contractors hired by Harbor Bay inspected the Kirlands' home for moisture. The contractors told Ms. Kirland that if they found anything of concern, Harbor Bay would contact her. Because she never heard anything, she reasonably believed, in light of those assurances, that there were no issues. The identities of those contractors are not currently known to Plaintiffs, but should be known to, and within the possession, custody, and control of Defendants.

30. Ms. Kirland later discovered that Harbor Bay generated a work order at that time, dated October 9, 2024. That work order, prepared by Harbor Bay personnel whose specific identities are not currently known to Plaintiffs but should be known to, and within the possession, custody, and control of Defendants, reported moisture in the home's stairs, hallway, and third and fourth bedrooms, and represented that the affected materials had been removed, dried, and rebuilt. On information and belief, no such remediation occurred at that time. Defendants did not inform the Kirlands that elevated moisture had been documented throughout their home until significantly later. The family continued residing in the residence without knowledge of the moisture intrusion Defendants had already identified.

31. On or about June 5, 2025, the family notified Harbor Bay that the persistent upstairs odor had intensified and spread to additional areas of the residence.

Around the same time, what appeared to be visible mold developed on the master bathroom air vent, prompting the family to submit additional maintenance requests. In response to the first request, an unidentified Harbor Bay employee represented that there were no odors or mold, that the visible growth was merely paint, and that the family had nothing to worry about. The identity of this employee should be known to, and within the possession, custody, and control of Defendants. Harbor Bay then closed the request without performing any remedial work. When the family complained again, Harbor Bay's Environmental Supervisor, Daniel Roman, attributed the odor to the family's cats, and that request was likewise closed. The remaining maintenance requests were marked closed without any work being performed. The family kept complaining about the odor and moisture and Harbor Bay eventually scheduled a moisture scan to identify any moisture-related conditions in the home.

32. On October 10, 2025, Clearity Environmental performed a licensed Moisture and Mold Assessment ("MMA") of the residence. The assessment documented widespread elevated moisture throughout the home, including visible moisture and staining within the HVAC closet and at the HVAC unit, moisture intrusion behind the downstairs bathroom toilet extending from floor to ceiling, and elevated moisture readings within the walls and ceiling of the master bedroom, as well as throughout the dining room, kitchen ceilings, living room ceiling perimeter, upstairs hallway, storage closet, and multiple upstairs bedrooms, with readings in some areas exceeding 40 percent and reaching into the 80 percent range. Based on these findings, Clearity

recommended extensive remediation throughout nearly the entire residence, including cleaning and remediation of the HVAC system.

33.    As a result of Clearity's findings, the Kirland family was displaced from the residence from approximately October 10, 2025, through December 12, 2025, while remediation was performed. The family's personal property was moved into the center of the room and covered with a plastic sheet, but the contaminated areas of the home being remediated were not properly contained or closed off from the rest of the home. This resulted in mold spores being spread across the home, into the carpet, and damaging the family's personal property. After being notified of this lack of containment and ensuing personal property damage, Harbor Bay employees apologized but refused to compensate the family for their lost property.

34.    The family returned to the residence on December 13, 2025, after being told by unknown Harbor Bay employees that their "home was safe" and "all the issues were addressed and corrected to standard," or words to that effect. The names of these unknown Harbor Bay employees are in the possession, custody, and control of the Defendants. These assurances were false and Defendants knew or should have known they were false. When the family returned home and when they notified Harbor Bay that the repairs were not complete, they were told to open a new maintenance ticket. Later, independent third-party mold testing was performed on January 21, 2026. Air and surface sampling throughout the home and its HVAC system revealed elevated and dangerous levels of toxic mold, including Penicillium/Aspergillus and Stachybotrys, well above levels found in an outdoor control sample.

11

35.     The following day, on January 22, 2026, Harbor Bay contractors cut into the subfloor of L.A.'s and M.K.'s bedrooms without establishing proper containment to prevent contamination from spreading throughout the residence. When confronted with visible black discoloration beneath the flooring, the contractors dismissed the condition as "just glue." The identity of these contractors should be known to, and within the possession, custody, and control of Defendants. Although portions of the insulation and subfloor were replaced, Harbor Bay failed to remove and replace carpet later confirmed to contain elevated and dangerous levels of toxic mold beneath L.A.'s bedroom floor. During the work, Harbor Bay personnel carried wet, mold-contaminated materials through occupied portions of the residence without containment, further exposing the family to mold and other hazardous substances.

36.     Throughout their tenancy, every member of the Kirland family experienced persistent physical and emotional symptoms consistent with prolonged exposure to moisture and mold. Ms. Kirland suffered chronic migraines and severe sleep disturbances. She requires ongoing neurological and pulmonary evaluation and monitoring for further deterioration in her health. PO1 Kirland and the children experienced allergies, sleep disruption, anxiety, and emotional distress. In addition, the children experienced significant regression in their academic performance and behavior.

37.     The Kirland family came into contact with and inhaled or ingested mold and other hazardous substances and suffered physical injuries, emotional distress, financial losses, and other damages as a direct result of Defendants' acts and omissions. Had the Kirland family known the true condition of the residence and the extent of

the moisture intrusion and mold contamination, they would not have moved into or remained in the home. They continue to worry about the long-term consequences of their exposure.

38.    Notwithstanding MacDill's status as a federal enclave, those of Plaintiffs' claims that seek recovery for personal injuries (including physical and emotional injuries) are governed, under 28 U.S.C. § 5001(b), by contemporary Florida law. Contemporary Florida law also governs Plaintiffs' claims because all of those claims arise out of Plaintiffs' injuries suffered as a result of Defendants' acts and omissions in leasing, managing, and maintaining the home Plaintiffs leased from Defendants, and Plaintiffs' lease, on information and belief, contains a choice of law provision selecting contemporary Florida law.

## CAUSES OF ACTION

### COUNT I: Breach of Contract
### (against Defendant AMC)

39.    Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

40.    Plaintiffs had a valid lease with AMC. AMC owed contractual obligations to Plaintiffs to provide and maintain habitable housing and remedy leaks, moisture, mold, and other issues. Plaintiffs have complied with all obligations under the lease.

41.    AMC failed to comply with the material terms of the lease by failing to ensure Plaintiffs' home was fit for human habitation and by failing to timely and adequately repair and remedy the conditions of the premises.

42.     As direct and foreseeable results of AMC's breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered substantial actual damages, including personal and property damages, financial damages, damages that require medical monitoring, and attorneys' fees and costs.

### COUNT II: Negligence
### (against all Defendants)

43.     Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

44.     Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home. Defendants negligently failed to meet the standard of care in performing those duties.

45.     As the property owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain their home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

46.     As property manager for Plaintiffs' MacDill home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate

moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

47. Defendants' acts and omissions in performance of their duties as Plaintiffs' lessors, landlords, and property managers fell far below the standard of care owed to Plaintiffs.

48. Defendants' acts and omissions breached the duty of reasonable care owed to Plaintiffs by failing to ensure that Plaintiffs' home was safe and fit for habitation.

49. Defendants breached the duty to exercise ordinary care in multiple respects, including, but not limited to: (a) failure to remediate defects they knew, or reasonably should have known, would cause moisture intrusion, elevated indoor humidity, and microbial growth; (b) failure to reasonably repair and remediate issues related to mold, moisture, and water leaks; (c) failure to adequately respond to Plaintiffs' complaints regarding unsafe conditions in their home; (d) failure to implement appropriate safety protocols to protect residents from toxic mold; (e) failure to take corrective action to address hazardous conditions in Plaintiffs' home of which Defendants had or should have had knowledge; (f) failure to properly install, maintain, or replace HVAC systems; (g) failure to meaningfully investigate the source of visible mold and odors in the home; (h) representing that documented moisture had been remediated when it had not; (i) failure to disclose the existence of known hazards; and (j) failure to establish proper containment during remediation activities, causing mold and other hazardous substances to spread within the home.

50. Defendants engaged in additional safety violations and breaches of the duty of care to be determined upon discovery.

51. Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiffs' home.

52. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

### COUNT III: Gross Negligence
### (against all Defendants)

53. Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

54. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home at MacDill. Defendants' conduct fell grossly below the applicable standard of care. Moreover, Defendants were recklessly indifferent to the consequences of their acts and omissions and failed to demonstrate even the slight diligence that a reasonable landlord or property manager would have exercised under the same or similar circumstances.

55. As the owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain Plaintiffs' home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

56. As property manager for Plaintiffs' home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate

moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

57.    Defendants were aware that circumstances in Plaintiffs' home constituted an imminent or clear and present danger amounting to more than normal or usual peril with tenants often complaining to Defendants of mold and illnesses.

58.    Defendants' acts and omissions fell grossly below the standard of care owed to Plaintiffs, and exhibited a conscious disregard for the consequences of their behavior, in multiple respects, including: (a) failure to remediate defects that would cause moisture intrusion and microbial growth; (b) failure to reasonably repair and remediate residents' complaints of water leaks and mold; (c) failure to implement appropriate safety protocols to protect residents from toxic mold; (d) failure to adequately respond to Plaintiffs' complaints regarding unsafe conditions in their home; (e) failure to warn Plaintiffs that they were being exposed to toxic mold; (f) failure to properly install, maintain, or replace HVAC systems; (g) failure to meaningfully investigate the source of visible mold and odors in the home; (h) representing that documented moisture had been remediated when it had not; (i) failure to disclose the existence of known hazards; and (j) failure to establish proper containment during remediation activities, causing mold and other hazardous substances to spread within the home; and (k)

engaging in additional safety violations and breaches of the duty of care to be determined upon discovery.

59.     Each of the Defendants' reckless indifference to the rights of Plaintiffs is the equivalent of an intentional violation of them.

60.     As a direct and proximate result of Defendants' gross negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT IV: Omitted**

**COUNT V: Negligent Infliction of Emotional Distress**
**(against all Defendants)**

61.     Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

62.     By their acts and omissions, Defendants caused Plaintiffs to be exposed to, come into direct physical contact with, and ingest and/or inhale mold within their home.

63.     As a result of that physical contact and exposure, Plaintiffs suffered physical injury, including, but not limited to, respiratory illness, and other bodily harm.

64.     As a direct consequence of these physical injuries, Defendants caused the Plaintiffs to suffer severe emotional distress, including worry, anxiety, anguish, suffering, and grief.

65.     Plaintiffs' claims for emotional distress arise directly from physical impacts and resulting physical injuries caused by Defendants' conduct. Each Plaintiff

18

sustained direct physical contact with toxic mold within the home and suffered resulting physical injuries, including respiratory illness, allergic reactions, skin conditions, and other bodily harm documented in this Complaint. Each Plaintiff's emotional distress arises from and is accompanied by these physical injuries.

66.    Defendants knew or should have known that Plaintiffs' home was unsafe to reside in, and that exposure to and contact with mold would inevitably occur and would result in physical harm to Plaintiffs. Defendants also knew or should have known that their assurances that Plaintiffs' homes were safe and not infested with mold, and their assurances that they would repair Plaintiffs' home, would cause Plaintiffs to remain in their home and suffer ongoing harm.

67.    Defendants knew or should have known that their statements that remediation was complete were, in fact, assurances that Plaintiffs' home was safe and not infested with mold, and that Plaintiffs would rely on those assurances and continue to occupy the home and suffer physical injury.

68.    As a direct result of Defendants' negligence and gross negligence, Plaintiffs came into physical contact with and ingested and/or inhaled mold.

69.    Plaintiffs suffered severe emotional distress as a result of that unhealthy and dangerous contact. Plaintiffs suffered physical injury as a result of the emotional distress.

70.    Plaintiffs have suffered, are suffering, and will continue to suffer severe emotional distress and associated harms because of Defendants' acts and omissions.

## COUNT VI: Intentional Infliction of Emotional Distress
### (against all Defendants)

71.    Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

72.    Defendants intentionally and knowingly subjected Plaintiffs to housing conditions that were unsafe and unhealthy.

73.    Defendants also recklessly misled Plaintiffs into moving into a home that they knew was dangerous and unfit for human habitation. Defendants then deceived the Plaintiffs into remaining in their home by falsely claiming that they would eliminate those dangers.

74.    This intentional conduct, which subjected Plaintiffs to risk of serious injury or injury over a prolonged period, was extreme and outrageous.

75.    Intentionally subjecting the Plaintiffs to such dangerous conditions and taking actions to ensure their continued exposure, is beyond all possible bounds of decency and intolerable in a civilized community.

76.    This conduct caused severe emotional distress, as Plaintiffs suffered serious injuries and watched their loved ones get sick, and eventually understood that they were constantly in grave danger in their own home.

77.    Plaintiffs suffered emotional and physical injury due to their severe emotional distress.

## COUNT VII: Breach of the Warranty of Habitability
### (against Defendant AMC)

78.    Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

79.    AMC breached express and implied warranties of habitability.

20

80.     AMC owed Plaintiffs a duty to provide them with habitable living conditions, under FLA. STAT. § 83.51, including but not limited to a duty to exercise reasonable care in the operation, inspection, management, and maintenance of Plaintiffs' home. AMC failed to meet the standard of care in performing those duties. On information and belief, in their lease, AMC warranted that the housing it provided was safe, habitable, and free from defects.

81.     AMC failed to live up to its duty to inspect the Plaintiffs' home prior to their moving in in order to make necessary repairs and transfer them to a reasonably safe home.

82.     After Plaintiffs moved in, AMC did not reasonably maintain the home to meet the ordinary and normal standards of fitness. The presence of moisture and mold in Plaintiffs' home was a dangerous condition that AMC should have remediated.

83.     As a result of AMC's breach of the express and implied warranties of habitability, Plaintiffs suffered substantial physical injuries and damage as well as harm to their personal property and other financial harm. Plaintiffs also suffered severe mental and emotional distress related to contact with and ingestion and/or inhalation of toxic mold. Plaintiffs suffered special damages and will require ongoing testing/medical monitoring.

### COUNT VIII: Third-Party Beneficiary Contract
### (against all Defendants)

84.     Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

85.     Defendants are bound by their contracts with the Air Force respecting MHPI housing at MacDill. Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members.

86.     The Operating Agreement originally entered into by AMC East, LLC and the Air Force creating AMC contains language establishing that Plaintiffs were intended beneficiaries of Defendants' contractual obligations with respect to the provision of housing at MacDill. On information and belief, the current version of any Operating Agreement under which AMC presently operates continues to contain such or similar language.

87.     On information and belief, the Ground Lease entered into by the Air Force and AMC also contains language indicating that Plaintiffs were intended beneficiaries.

88.     On information and belief, property management agreements governing Defendants' property management practices at MacDill also contain provisions indicating that Plaintiffs were intended beneficiaries of those agreements.

89.     Defendants and the Air Force intended to benefit the service members living at MacDill. PO1 Kirland is a serviceman living at MacDill with his family. The obligations to provide these intended benefits were included in the underlying contracts to ensure military service members, including Plaintiffs, would be provided with safe and habitable housing.

90. Defendants breached the requirements of the underlying contracts by failing to provide suitable management, maintenance, operations, and renovations of Plaintiffs' home.

91. Defendants also breached the duty of good faith and fair dealing implied in the contracts.

92. As a foreseeable result of the Defendants' breaches of the contracts, Plaintiffs, who are intended, direct, third-party beneficiaries of such contracts, sustained damages.

## COUNT IX: Negligence Per Se
### (against all Defendants)

93. Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

94. Defendants owed Plaintiffs a duty to take steps to protect them from the specific injuries outlined in this Complaint.

95. This duty was created by statutes specifically intended to protect Plaintiffs from those harms.

96. For example, section 19-231 of Tampa's Code of Ordinances states that, "No person shall occupy or let to another for occupancy or offer to let to another for occupancy any dwelling or dwelling unit which does not comply with the following standard." Tampa Code of Ordinances § 19-231. It then outlines a list of specific requirements intended to protect residents' health and safety. Defendants failed to comply with these requirements, including:

a) "*General condition of rental unit.* Each dwelling unit let or offered to let shall be clean, sanitary, fit for human habitation and in a good state of repair." *Id.* § 19-231(17);

b) "Every floor, wall and ceiling shall be capable of affording privacy and shall be maintained in a good state of repair." *Id.* § 19-231(10);

c) "*Plumbing fixtures and pipes.* Every plumbing fixture and water and waste pipe shall be maintained in good working condition, free from defects, leaks and obstructions." *Id.* § 19-231(13);

d) "*Kitchen and bathroom floors.* Floors in kitchens and bathrooms, except where constructed of materials impervious to moisture, shall be covered with asphalt, vinyl-plastic, rubber tile, ceramic tile, terrazzo or linoleum or other durable, waterproof, nonabsorptive material." *Id.* § 19-231(14)(a);

e) "*Flooring generally.* All other flooring throughout the dwelling shall be of approved grade and type of material properly installed." *Id.* § 19-231(14)(b).

97. Defendants also failed to comply with § 19-232, which provides that, "The owner shall be responsible for the repair and replacement of all plumbing facilities and equipment." *Id.* § 19-232(7).

98. Defendants also failed to comply with § 19-47, which provides that, "Nothing shall be allowable on the premises within the corporate limits of the city provided for in this chapter that shall in any way be offensive or noxious by reason of

the emission of odors, gases, dust, smoke, light, vibration or noise … nor shall anything be constructed or maintained that would in any way constitute an eyesore or nuisance to adjacent property owners or residents or to the community." *Id.* § 19-47.

99.    Additionally, Florida has a statutory framework regulating mold-related services in order to protect Plaintiffs from the injuries described above. FLA. STAT. § 468.84 *et seq*.

100.    The Florida legislature determined that this statutory framework is "necessary in the interest of the public safety and welfare, to prevent damage to real and personal property, to avert economic injury to the residents of this state, and to regulate persons and companies that hold themselves out to the public as qualified to perform mold-related services." *Id.* § 468.84.

101.    Defendants failed to comply with the following statutory requirements:

    a)  "A person may not … perform or offer to perform any mold assessment unless the mold assessor has documented training in water, mold, and respiratory protection under § 468.8414(2)." *Id.* § 468.8419(1)(a);

    b)  "A person may not …  perform or offer to perform any mold remediation to a structure on which the mold assessor or the mold assessor's company provided a mold assessment within the last 12 months." *Id.* § 468.8419(1)(d);

    c)  "A person may not … accept an engagement to make an omission of the assessment or conduct an assessment in which the assessment itself, or

the fee payable for the assessment, is contingent upon the conclusions of the assessment." *Id.* § 468.8419(1)(h);

d) "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …perform or offer to perform any mold remediation unless the remediator has documented training in water, mold, and respiratory protection under § 468.8414(2)." *Id.* § 468.8419(2)(a);

e) "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …perform or offer to perform any mold assessment to a structure on which the mold remediator or the mold remediator's company provided a mold remediation within the last 12 months." *Id.* § 468.8419(2)(d).

102.  Plaintiffs are members of the class that each of the above statutes were designed to protect.

103.  The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by Plaintiffs and described in this Complaint.

104.  Additionally, Florida Statutes § 386.03, § 386.051, and § 386.041 make it unlawful to maintain a sanitary nuisance as defined in Florida Statute § 386.01, and any other applicable statutes, codes, and regulations governing the habitability of residential housing and the health and safety of occupants.

26

105. The violations of these statutes constitute negligence per se and were the proximate cause of Plaintiffs' injuries.

## COUNT X: Medical Monitoring
### (against all Defendants)

106. Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

107. Plaintiffs suffered physical injuries when they were exposed to hazardous mold, as described in this Complaint.

108. As a result of their prolonged exposure to moisture-damaged indoor environments and associated microbial contamination, the Kirland family faces an increased and individualized risk of developing chronic and latent health conditions.

109. Ms. Kirland experienced chronic migraines and severe sleep disturbances during the period of exposure and requires ongoing neurological and pulmonary evaluation and monitoring for further deterioration in her health.

110. PO1 Kirland and the minor children, R.K., L.A., and M.K., developed allergies, sleep disruption, anxiety, and behavioral and academic changes during the same period and require evaluation for any exposure-related contribution to those conditions, as well as continued monitoring given their prolonged residence in the affected home.

111. All minor Plaintiffs, whose immune and respiratory systems are still developing, face heightened long-term vulnerability from prolonged exposure to moisture and mold, making early and ongoing monitoring particularly critical, especially

given the allergic symptoms, sleep disruption, and behavioral changes R.K., L.A., and M.K. began experiencing during their tenancy.

112.    A January 21, 2026, independent air and surface sampling identified elevated and dangerous levels of toxic mold, including Penicillium/Aspergillus and Stachybotrys, throughout the residence and its HVAC system, providing laboratory-confirmed contamination data supporting this count.

113.    Early detection through monitoring is important because the chronic and latent conditions associated with sustained mold exposure, including reactive airway disease, asthma, chronic sinusitis, and hypersensitivity pneumonitis, may not manifest clinically for months or years after the exposure ends. The monitoring protocols required will differ for each Plaintiff based on their individual presentations, but each member of the Kirland family would benefit from regular evaluation.

114.    The monitoring procedure would be unnecessary in the absence of Plaintiffs' exposure.

115.    Given the exposure, monitoring regimes are reasonably necessary according to contemporary scientific principles.

116.    Plaintiffs are entitled to the cost of medical monitoring necessary to detect the onset or worsening of physical harm and/or, in the alternative, that the Court use its equitable powers to create and supervise a medical monitoring fund.

### COUNT XI: Unjust Enrichment
### (against Defendant AMC)

117.    Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

28

118.    Plaintiffs conferred a benefit on AMC in the form of the BAH rent that the military transferred on their behalf. These funds belonged to Plaintiffs and were paid to AMC in return for safe and habitable housing at MacDill.

119.    AMC failed to provide Plaintiffs with safe and habitable housing and failed to fully compensate Plaintiffs for the costs and inconvenience of their displacement. It would be inequitable and unjust for AMC to retain the BAH funds provided by Plaintiffs.

120.    Plaintiffs are entitled to restitution of some or all of the BAH funds paid to AMC.

### COUNT XII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Unfair Conduct) (against all Defendants)

121.    Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

122.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

123.    At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA. FLA. STAT. § 501.203.

124.   At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA. *Id.*

125.   Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

126.   On information and belief, Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions, including policies and procedures for the treatment and remediation of mold.

127.   Defendants' acts and practices exposed Plaintiffs to unsafe and unhealthy conditions, including toxic mold, structural defects, water leaks, and HVAC issues. These abhorrent conditions were known to Defendants.

128.   Given those unconscionable conditions, Plaintiffs' interests in their MacDill home were only worth a small fraction of the rental payments for that home.

129.   Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair and unconscionable within the meaning of the FDUTPA and thus violated the FDUTPA.

130.   As a result of Defendants' unfair and unconscionable acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT. § 501.211.

## COUNT XIII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Deceptive Conduct)
### (against all Defendants)

131.    Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

132.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful deceptive acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

133.    At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, *see id.*, *e.g.*, § 501.203.

134.    At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA, *see id.*

135.    Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted false, misleading, and/or deceptive acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

136.    On information and belief, AMC, as signatory to the lease, and all Defendants, through Harbor Bay's direct and ongoing communication with Plaintiffs, engaged in deceptive acts and practices, including the following:

a) Defendants concealed facts and made deceptive assurances that caused Plaintiffs to sign a lease that they never would have signed had they known the truth;

31

b) Defendants made false, misleading, and/or deceptive representations that Plaintiffs' MacDill home was in habitable condition and thus far more valuable than it was in reality;

c) On information and belief, in the lease between Defendants and Plaintiffs, Defendants falsely warranted that Plaintiffs' housing was safe, habitable, and free from defects;

d) Defendants failed to disclose information that they knew about the condition of Plaintiffs' housing with the intention of inducing Plaintiffs into leasing the home at a cost beyond what it was actually worth;

e) Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants falsely claimed that they would mitigate or fix those problems;

f) Defendants made false, misleading, and/or deceptive representations that repairs and remediation efforts were performed completely and to the standard of care required of professional landlords;

g) Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts.

137. For example, on information and belief, Defendants concealed the true condition and maintenance history of the home from the family before they moved in, on or about July 1, 2024. Harbor Bay representatives made representations which they knew or should have known were false, including that the home had been fully

inspected and that no mold was present. They made these representations in order to induce the family to accept the residence.

138.   As another example, Defendants, through Harbor Bay Project Manager Aaron Vaughn and Environmental Supervisor Daniel Roman, represented in or around July 2024, that a persistent musty odor detected in an upstairs bedroom was attributable to pets rather than testing for moisture or mold. Defendants also generated a work order dated October 9, 2024, representing that hurricane-related moisture in the stairs, hallway, and third and fourth bedrooms had been removed, dried, and re-built, when, on information and belief, no such remediation occurred, and elevated moisture continued to develop throughout the residence, as later confirmed by Clearity Environmental's October 10, 2025, assessment.

139.   As a result of Defendants' deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT. § 501.211.

140.   Plaintiffs paid far more in rent than their home was actually worth.

141.   Due to their role in the leasing and/or management and maintenance of the Plaintiffs' home at MacDill, Defendants were uniquely aware of the condition of Plaintiffs' home, maintenance history, defects in design, the need for repairs, remod-eling, and remediation, and the existence of mold and other hazardous conditions.

142.   As a result of Defendants' false, misleading, and deceptive acts or prac-tices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. *Id.* § 501.211.

## COUNT XIV: Negligent Misrepresentation Concerning Condition of the Home
## (against all Defendants)

143.   Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

144.   On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition and free of mold, mildew, and signs of water intrusion.

145.   Before the family moved into the residence, on or about July 1, 2024, Harbor Bay representatives represented to PO1 and Ms. Kirland that the home had been fully inspected, that all previously identified issues had been remediated, and that no mold was present, representations that were material given that the family was relocating their household, including three minor children, into the residence based on those assurances. Defendants knew or should have known that these representations were untrue.

146.   Defendants either knew that Plaintiffs' home was unsafe and unfit for human habitation, made representations concerning the safety and habitability of the home without knowledge of their truth or falsity, or should have known that such representations were false.

147.   Defendants intended to convince Plaintiffs to sign a lease and move into their home based on these representations.

148.   Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions to move into their home.

149. Plaintiffs justifiably relied on Defendants' assurances that their home was safe, mold free, and fit for human habitation at the time that they moved in.

150. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

### COUNT XV: Negligent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions
### (against all Defendants)

151. Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

152. Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants, including via Harbor Bay, downplayed the severity of those problems in order to convince Plaintiffs to remain in their home.

153. Defendants falsely represented that hazardous and unsafe conditions, including mold and elevated indoor moisture, would be fixed. Defendants knew or should have known that this was untrue.

154. Defendants falsely told Plaintiffs that there was no moisture in their home, when they knew or should have known that there was moisture.

155. Defendants engaged in cosmetic repairs that disguised the continuing hazardous and unsafe conditions while telling Plaintiffs that repairs had been successfully completed.

156. Defendants, through Harbor Bay Project Manager Aaron Vaughn and Environmental Supervisor Daniel Roman, represented in or around July 2024 that a

persistent musty odor detected in an upstairs bedroom was attributable to pets rather than testing for moisture or mold. Defendants also generated a work order dated October 9, 2024, representing that hurricane-related moisture in the stairs, hallway, and third and fourth bedrooms had been removed, dried, and rebuilt, when, on information and belief, no such remediation occurred, and elevated moisture continued to develop throughout the residence, as later confirmed by Clearity Environmental's October 10, 2025, assessment. Defendants knew or should have known that these representations were untrue.

157.    When Plaintiffs persisted in demanding that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take appropriate steps to mitigate or fix those problems. Defendants either knew that they would never take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.

158.    On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when they knew or should have known that they had not adequately done so.

159.    For example, on January 22, 2026, Harbor Bay contractors cut into the subfloor of two of the Kirland children's bedrooms, encountered visible black discoloration, and dismissed the condition as "just glue" rather than disclosing it as suspected mold. It was later confirmed to be mold.

160.    Defendants intended to convince Plaintiffs to remain in their home or agree to continue their occupancy based on these false representations.

161. Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions whether to remain in their home.

162. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

163. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial damages, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

## COUNT XVI: Fraudulent Inducement
### (against all Defendants)

164. Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

165. Defendants deliberately, willfully, and knowingly made false and material statements regarding the habitability and safety of Plaintiffs' housing as described in detail in this Complaint in order to induce Plaintiffs to sign a lease.

166. Defendants' false and misleading representations included representing to the Kirland family, through Harbor Bay representatives, before they moved into their residence, on or about July 1, 2024, that the home had been fully inspected, that all previously identified issues had been remediated, and that no mold was present.

167. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew this was false at the time or made this representation without any reasonable basis to know whether it was true.

37

168.   These representations were material to Plaintiffs' decisions to enter into their lease causing Plaintiffs' BAH to be paid to Defendants.

169.   Plaintiffs relied on Defendants' assurances that their home was safe and fit for human habitation at the time that they moved in.

170.   Defendants knew that these statements, including the representations in the lease, were false. But for the Defendants' false statements, Plaintiffs would not have signed the lease for their MacDill home.

171.   As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require ongoing medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

### COUNT XVII: Fraudulent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions
### (against all Defendants)

172.   Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

173.   Defendants, including via Harbor Bay, deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiffs' housing, in order to cause Plaintiffs to remain in their home notwithstanding the unsanitary and dangerous conditions in the home.

174.   Defendants made false statements to Plaintiffs that their home was suitable for habitation throughout the course of Plaintiffs' residence in the home.

175.   Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants consistently, deliberately, and falsely downplayed the severity of

those problems. Defendants knew the true severity of those conditions, based on information including their own personnel's direct observations of the reported odor and their own October 9, 2024 work order, documenting the moisture conditions described in this Complaint.

176. When Plaintiffs persisted in demanding that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take steps to mitigate or fix those problems. Defendants knew that they would never do so.

177. On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when they knew that they had not adequately done so.

178. Defendants knew that the statements concerning the condition and maintenance of the home and the promised remediation were false.

179. In or around July 2024, Defendants, through Harbor Bay Project Manager Aaron Vaughn and Environmental Supervisor Daniel Roman, falsely attributed a persistent musty odor to pets rather than testing it for moisture or mold. Similarly, Harbor Bay generated a work order dated October 9, 2024, falsely representing that hurricane-related moisture in the stairs, hallway, and third and fourth bedrooms had been removed, dried, and rebuilt, when no such remediation occurred and elevated moisture continued to develop throughout the residence.

180. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

181. These representations were material to Plaintiffs' decisions to remain in their home.

182. But for Defendants' false statements, Plaintiffs would not have remained in their MacDill home.

183. As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

### COUNT XVIII: Fraudulent Concealment of Condition of Housing
### (against all Defendants)

184. Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

185. Defendants deliberately, willfully, and actively concealed material facts regarding the habitability and safety of the Plaintiffs' housing in order to cause Plaintiffs to sign a lease for their MacDill home.

186. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of any water intrusion. Defendants either knew that this would conceal the true conditions at their home or made this representation without any reasonable basis to know whether it was true.

187. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of hazardous and unsafe conditions in their home.

40

188.    Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

189.    Defendants knew that the concealed or omitted facts were material to Plaintiffs' decisions to sign a lease and move into their home and should have been disclosed.

190.    Defendants knew that their concealments would induce Plaintiffs to act.

191.    Plaintiffs relied on Defendants' concealments and omissions.

192.    On information and belief, Defendants concealed the true condition and maintenance history of the home from the family before they moved in, on or about July 1, 2024. Harbor Bay representatives falsely stated that the home had been fully inspected and that no mold was present, in order to induce the family to accept the residence.

193.    But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have signed the lease for their MacDill home.

194.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

### COUNT XIX: Fraudulent Concealment Concerning Repair and/or Remediation of Unsafe Conditions
### (against all Defendants)

195.    Plaintiffs incorporate the allegations set forth in paragraphs 1–38.

196. Defendants, including through Harbor Bay, deliberately, willfully, and actively concealed material facts regarding the habitability and safety of Plaintiffs' housing in order to cause Plaintiffs to remain in their MacDill home.

197. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of continuing hazardous and unsafe conditions in their home.

198. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

199. Defendants fraudulently concealed ongoing dangers in the home by engaging in cosmetic repairs that disguised the continuing hazardous and unsafe conditions while telling Plaintiffs that repairs had been successfully completed.

200. In or around July 2024, Defendants fraudulently concealed ongoing dangers in the home by representing, through Harbor Bay Project Manager Aaron Vaughn and Environmental Supervisor Daniel Roman, that a persistent musty odor was attributable to pets rather than testing it for moisture or mold, and by failing to disclose to the Kirland family that, following Hurricane Milton, elevated moisture had been documented throughout the stairs, hallway, and third and fourth bedrooms of the residence.

201. Defendants further fraudulently concealed ongoing dangers in the home when, on January 22, 2026, Harbor Bay contractors cut into the subfloor of two of the Kirland children's bedrooms, encountered visible black discoloration, and dismissed

the condition as "just glue" rather than disclosing it as suspected mold. It was later confirmed to be mold.

202. Defendants knew that the concealed or omitted facts were material to Plaintiffs' decisions to remain in their home and should have been disclosed.

203. Defendants knew that their concealment or omission would induce the Plaintiffs to act or refrain from acting.

204. Plaintiffs relied on Defendants' concealments and omissions.

205. But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have remained in their MacDill home.

206. As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiffs have sustained damages and injuries and are entitled to recover damages related to the following, including but not limited to:

      a. Past and future physical pain and suffering;

      b. Past and future mental anguish and emotional distress;

      c. Past and future medical, healthcare, and attendant care expenses;

      d. Past and future lost income and earning capacity;

e. Past and future physical impairment;

f. Past and future loss of enjoyment and quality of life;

g. Past and future loss of enjoyment of property;

h. Increased risk of future harm and medical monitoring for life;

i. Loss of life expectancy;

j. Out of pocket expenses;

k. Loss of and/or damage to personal property;

l. Costs, expenses, and fees, including attorneys' fees; and

m. Punitive damages.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

A. Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B. Award punitive damages as appropriate, including for counts III, V, VI, VII, IX, XIV, XV, XVI, XVII, XVIII, and XIX in an amount to be determined at trial;

C. Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which they may be entitled by law, and;

D. Grant the Plaintiffs such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.


DATED: July 29, 2026.        Respectfully submitted,

/s/ Robert J. McKee
Robert J. McKee
Florida Bar No.: 972614
THE MCKEE LAW GROUP, LLC
2800 South Flamingo Road
Davie, Florida 33330
Tel: (954) 888-9877
Fax: (954) 217-0150
Email: rmckee@themckeelawgroup.com
Lead Counsel

Kristina Baehr*
Christopher LaCour*
JUST WELL LAW, PLLC
1809 Pearl Street
Austin, Texas 78701
Tel: (512) 693-8029
Email: Kristina@well.law
Email: Chris@well.law
Email: Militaryhousing-lit_PLslistserv@well.law

Vincent J. Colatriano*
Michael Weitzner*
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: 202-220-9600
Fax: 202-220-9601
Email: vcolatriano@cooperkirk.com
Email: mweitzner@cooperkirk.com

*Pro Hac Vice forthcoming

Attorneys for Plaintiffs

45